Filed 6/4/19; Opinion on rehearing

CERTIFIED FOR PARTIAL PUBLICATION[*]

OPINION ON REHEARING

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D073103 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE338332) |
| SALVADOR R. GUTIERREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge. Affirmed in part, reversed in part with instructions.

Nancy J. King and Laura G. Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Alana Butler and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of the Factual and Procedural Background, and parts I and II.A. of the Discussion.

A jury convicted defendant Salvador R. Gutierrez of nine counts of committing lewd and lascivious acts upon a child (Pen. Code,[1] § 288, subd. (a)). In a bifurcated proceeding, the court found true that defendant had been convicted of two serious felonies (§§ 667, subd. (a)(1), 668 & 1192.7, subd. (c)) and two prior strike offenses (§§ 667, subds. (b)-(i), 668 & 1170.12), and found one of defendant's prior convictions brought him within the One Strike law (§ 667.61, subds. (a), (c), and (d).) The court thus sentenced defendant to 205 years to life in state prison.

Defendant appealed, arguing (1) his counsel was ineffective for failing to object to the use of an Arizona conviction for impeachment purposes because it was not a crime of moral turpitude, and (2) the court violated his Sixth Amendment right to a jury trial when it determined that this child molestation conviction constituted a serious felony and strike prior under California law because the court had made factual findings regarding the underlying offense. As set forth in *People v. Gutierrez* (May 22, 2017, DO69706 [nonpub. opn.] (*Gutierrez I*)), we rejected defendant's first argument, but agreed with his second, finding a lack of substantial evidence to support the court's finding that his Arizona conviction constituted a serious felony or strike prior under California law. We remanded the case for resentencing, and affirmed the judgment in all other respects.

At resentencing, the court imposed on defendant a revised term of 35 years plus 100 years to life in prison, as explained *post*.

---

1    All further statutory references are to the Penal Code.

2

In the instant appeal, defendant contends for the *first* time that his new sentence constitutes cruel and unusual punishment because at the age of about 69 (when he filed his opening brief), the court's sentence means "he will die in prison before he even complet[es] the determinate part of his sentence." Defendant contends his sentence " 'shocks the conscience and offends fundamental notions of human dignity' [citation]" because he committed the offenses for which he is being punished about "10 to 15 years" ago, which punishment "was enhanced due to an offense [he] committed in 1988."

As we explain, we conclude defendant forfeited this claim by his failure to raise it either in connection with *Gutierrez I* or in the trial court following remand. However, to forestall a claim of ineffective assistance of counsel with respect to this specific issue, we further conclude defendant's sentence does not violate either the federal or state constitutional prohibition on cruel and/or unusual punishment.

Defendant in an April 8, 2019 petition for rehearing (petition) alleged that remand was necessary to allow the court to exercise its discretion and determine whether to dismiss one or more of the five-year enhancements imposed under section 667. He also alleged for the first time that the court erred in imposing various fines, fees, and assessments without first affording him a separate ability-to-pay hearing, in reliance on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1160 (*Dueñas*). We granted the petition and, on this court's own motion, invited the parties to file supplemental letter briefs addressing only whether defendant was entitled to such a hearing under *Dueñas*, or whether defendant has forfeited this issue based on his failure to raise it in the trial court,

3

both in connection with the instant appeal and in *Gutierrez I*. The parties submitted supplemental letter briefs, which we have read and considered.

As we explain, we remand *solely* for the court to exercise its discretion and determine whether to impose one or more of the five-year enhancements under section 667. In all other respects (including with respect to the imposition of fines, fees, and assessments), the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

*Defendant's Sexual Abuse of his Granddaughter*

Defendant's daughter, Paula H., had a daughter, victim Raquel G., born in 1993. Raquel testified that when she was young she spent very little time with her own father, as her parents had separated when she "was really little." In fact, Raquel could not even remember a time when her parents were together. As a result, Raquel was close to her mother and older brother, and to defendant, whom she described as a "father figure."

Raquel testified that growing up, she and her family spent a great deal of time with her grandparents, including defendant and her grandmother Gloria, as they were "always at their house," which also was located in San Diego. Raquel recalled being cared for by defendant when her mother Paula was at work. When she was about eight years old and in third grade, Raquel recalled defendant sometimes would come in the morning to their family home, stay with them after Paula left for work, and then either walk or drive her and her brother to school, which was located a few blocks away. Defendant also sometimes picked Raquel up from school. It was around this time period that defendant started doing "inappropriate" things to Raquel.

Raquel testified the first incident, like all others, took place in a "tuxedo shop" located in Lemon Grove, California, that defendant owned and operated. She testified, "I can't remember if he took off my clothes or if he told me to, but I was—I had my clothes off. And he made it seem like it would be fun if I let him touch me. He made me touch his penis and—and he would—I think he took his pants off and made me touch him." During this incident, defendant touched, but did not insert his fingers inside, Raquel's vagina. Defendant also put his "mouth on [her] vagina." Raquel recalled during this particular incident defendant also hoisted her up onto the copier located in the back of the shop and made copies of her naked bottom.

Raquel testified during this incident she shook her head "no" as defendant grabbed her hand and placed it on his penis. Defendant then "manipulated" her hand while it was on his penis and made her "jack him off." When Raquel tried to remove her hand from his penis, defendant made her "put it back on there." Raquel was "pretty sure" defendant ejaculated during this first incident. At the time, Raquel did not know what it meant to ejaculate, nor did she understand "what was happening" at the time or whether it was "right or wrong." After this incident, and all others, defendant made her go to the bathroom and "clean" herself. Once inside the bathroom, Raquel looked in the mirror and "started crying." Defendant also instructed Raquel not to tell anybody about the incident.

Raquel recalled the next incident with defendant "got a little worse" than the first. She testified, "He [i.e., defendant] did the same things that he did the first time, but then the second time he asked me if I would be okay if he put his fingers in me, and I said no.

5

And he just kind of was, like, 'Oh, it will be okay.' So he did it and then I screamed." Raquel recalled this incident took place after school near the front door of the tuxedo shop.

During this second incident, Raquel was naked. As before, defendant "made [her] masturbate him." Also as before, defendant "put his mouth on [her] vagina." When Raquel pulled her hand away from defendant's penis, "he finished" by masturbating himself, ejaculated, then instructed Raquel to clean herself in the bathroom.

Raquel recalled another incident that took place around the time of defendant's birthday. There was a party for defendant with much of the family in attendance. During the party, defendant claimed he needed to take care of "some business at the tuxedo shop." Defendant asked Raquel to accompany him to the shop. Raquel refused, as she "had a feeling" defendant again would sexually abuse her. Defendant insisted, and Raquel reluctantly went with him.

During this incident, defendant took off Raquel's clothes. Raquel recalled there was a "church service going on next door," "so it was pretty loud, and he—he was playing—he was, like, touching [her] vagina. And he had me, like, reaching over to masturbate him. And then he stopped and he said what if I try to—he said, 'What if I try this time,' and he like, pulled out his penis and tried to stick the tip of it in." Raquel testified that this incident took place on the floor; that when he tried to put his penis in her vagina, she said "no really loud"; that his penis touched, but did not penetrate, her vagina; that he in response put his hand over her mouth and told her, "I need it to be quiet

because there [were] people walking back and forth outside"; and that she "was traumatiz[ed]" by this incident.

Like the two other incidents, defendant ejaculated, this time on Raquel's stomach. Also as before, defendant instructed Raquel to clean herself and not to tell anyone what he had done.

In addition to these three incidents, Raquel recalled defendant sexually abused her on other occasions as well. With respect to these other incidents, she testified, "I remember them, but it's just like he—he did the same things every time. I don't really remember how far they were apart when he did it or what . . . ." Raquel recalled that all of these incidents took place "over a long period of time, like, months" or perhaps over a year.

Raquel further testified that she was "sure" that there were at least four incidents of sexual abuse by defendant, but there "were probably more than that"; and that with respect to all four incidents, there were at least two occasions when he: (1) used his fingers and touched her vagina; (2) placed his mouth on her vagina; (3) forced her hand to touch his penis; (4) and ejaculated on her stomach. Also during the four incidents, defendant at least one time tried to put his penis inside Raquel's vagina.

When asked if there were any incidents of abuse away from the tuxedo shop, Raquel recalled an incident when defendant came to their home to watch her and her brother and take them to school. After Paula left for work and as her brother slept, defendant asked Raquel "to touch him." She refused, and "nothing ever happened."

7

Before she disclosed the abuse, Raquel testified her mother "often" asked her if " 'anyone ever touched [her]? Has grandpa [i.e., defendant] ever [done] anything to [her],' " to which Raquel would always lie and respond "no." Raquel further testified she denied any inappropriate touching by defendant because she "was a kid" who felt "scared" and "ashamed," thinking she was "wrong" for what had happened.

Raquel told Paula about the abuse by defendant a "couple years later," after her mother made plans to have defendant watch the children so that she and a friend could travel to Colorado for a wedding. Raquel testified that she then "begged" her mother not to leave them in defendant's care; that her mother became concerned and suspicious because she had "never seen [Raquel] . . . that scared before, and panicky"; and that because her mother kept asking what was wrong, Raquel finally disclosed she had been sexually abused by defendant.[2]

---

[2] The record shows the People called Catherine McLennan to testify as an expert witness. McLennan, who estimated she had conducted over 3,000 forensic interviews (as of 2015), opined there was "pretty universal agreement" among experts that the "majority" of children "most commonly delay disclosing when they have been sexually abused." McLennan further opined that it was "unusual" in child sexual abuse cases for there to be an "immediate" report; and that on one end of the spectrum, children are much more likely to disclose immediately if they have been abused by a stranger. In that instance, there "are few repercussions, fewer possible negative outcomes for that child in telling. They don't know the person. They're not bonded to them. They're not telling on somebody that they care about. It's not likely to have a big impact on that child's life to tell." On the other end of the spectrum, McLennan noted that if the child is abused by a caretaker, a parent, or a "parent figure, there's a huge bond. There's a huge possible allegiance or loyalty to that individual. There is a perception on the child's part that if they tell on this person, who's very close to them, there's very likely to be some changes in their lives, and some of those are viewed by the child as not necessarily positive."

8

Raquel, however, never gave her mother the "details" about the abuse. After her disclosure, Raquel recalled her mother "talked to someone" about the abuse and then told her, "It's taken care of," or words to that effect. Raquel testified her mother then did not tell Raquel that defendant had a prior conviction for child molest, or that her mother also had been sexually abused by defendant when she was a child.

Once she disclosed the abuse, Raquel testified that "things" changed, as her grandmother moved north and Raquel's family "stopped talking to that side of the family a little bit"; and that it was a "hard transition" for her because it "felt like everyone was just kind of leaving [her], like it was [her] fault."

Raquel further testified she was interviewed multiple times by a child welfare agency when she was young, before defendant abused her, and twice after the abuse occurred. She was interviewed on October 16, 2002, when she was nine years old. On that occasion, the agency was investigating a report of physical abuse by Raquel's father against her brother. Raquel denied any inappropriate touching by defendant or anyone else during this interview, and during another interview on April 22, 2004, when she was 10 years old, despite the fact defendant had sexually abused her. Although Raquel did not tell the agency social workers about the abuse, she did tell a friend. The family subsequently moved to Temecula after Raquel finished seventh grade.

While in ninth grade, Paula insisted her daughter see a counselor, as Raquel was not doing well in school or at home. Raquel testified she then "wanted to kill [herself]" because "of what [defendant] did to [her]." During a counseling session, Raquel opened up and disclosed the abuse by defendant.

9

Thereafter, law enforcement became involved. Raquel spoke to a police officer, perhaps by telephone, and then was interviewed at her school by two officers and a social worker. Although Raquel could not recall the date of the school interview, an agency report noted it took place on September 24, 2008. Raquel recalled during this interview she disclosed that defendant had "raped [her], that he touched [her]." After making this disclosure, according to Raquel "nothing" happened and "[n]o one ever contacted [the family] again about it." The family subsequently moved to South Carolina.

After the move, Raquel and her mother in 2013 contacted the Riverside and/or San Diego Police Departments to follow up on the status of the investigation of defendant. Raquel recalled speaking with an officer on the telephone. When asked why she wanted to make that call, Raquel stated, "I wanted to have justice for myself." At some point, law enforcement had Raquel attempt to contact defendant by telephone, with the hope he would confess to sexually abusing Raquel. Defendant, however, did not answer or return her calls. When asked how she felt about testifying against her own grandfather, Raquel stated she no longer considered defendant to be her grandfather because "people who love you wouldn't do that to you, what he did to me."

Paula testified after having two children, including Raquel, she went back to work. She estimated she began working when Raquel was in the first grade. Paula typically worked four days a week, all day long. After about three years, Paula changed jobs, which sometimes required her to go to work at 6:30 a.m. Being a single mother, Paula had to rely on various family members to help with childcare. At one point, Paula's mother Gloria suggested defendant could help with the children. Paula testified she

10

asked Gloria if this was a good idea "due to his background." Gloria reassured her daughter, stating defendant was "fine" and "had recovered from his previous actions involving molesting."

Paula testified that defendant left Gloria in about 2002 and that she and the children moved to Temecula in about 2005, when Raquel was in 8th grade. Paula recalled she and her boyfriend (now husband) were going to a wedding in early September 2004. Paula had asked her mother to watch the children while they were away. Gloria agreed, but was going to be a day "late" arriving to San Diego. Gloria suggested defendant as an alternative. Paula told Raquel that her grandfather was going to watch her and her brother for a day. Raquel in response stated she "wasn't comfortable" with that arrangement. Based on "motherly instinct," Paula began questioning Raquel.

Initially, Raquel refused to tell her mother about the abuse. As Paula prodded, Raquel finally disclosed the sexual abuse by defendant. Raquel did not give her mother many details, other than disclosing the abuse had been "years before." Paula testified she immediately set up a conference call involving Gloria, Paula's aunt, who was defendant's sister, and defendant, to make sure they were "all on the same page."

During this call, Paula disclosed what Raquel had just told her, and instructed defendant to "stay the heck away from [her] daughter and not to come around [her family]." Paula testified that during this call, defendant (in Spanish) said, "I'm sorry, mija, I'm sorry, mija," noting that "mija" in Spanish meant daughter. Paula refused to accept defendant's apology, telling him at one point, "How dare you." Paula ended up

11

taking Raquel with her to Colorado. On their trip (and despite Raquel's recollection to the contrary), Paula testified she told her daughter that defendant also had molested her when she was a child.

Paula did not contact law enforcement after Raquel's disclosure. Paula testified, "When I was a child and these type of instances would happen, such as when I was molested, it was usually resolved in the family, so when I mentioned it to my mom, my mom spoke with the same sister that I had called when it happened to Raquel, and at that time when—so that's basically how it was—that is basically the way it was resolved when I was a child, is you talked to the family, they talk to the person, the person stops; so I believed that I would speak to my family, let them know, that they would—that they would deal with the situation the same way."

After moving to Temecula, Paula noticed "something was bothering" Raquel. After Raquel repeatedly said, "Mom, you don't understand," Paula urged her daughter to see a counselor because if Raquel was not going to speak with her mother, or her stepdad, she needed to talk to someone. Raquel finally agreed, and met with a counselor when she was in the 10th grade. The day after Raquel started counseling, law enforcement from Riverside became involved. During an interview with law enforcement, Paula also disclosed that defendant had molested her when she was a child.

Because the abuse occurred in San Diego, law enforcement from San Diego also became involved.[3] Several years passed and the family, who had since moved to South Carolina, never heard back from any law enforcement agency. After leaving quite a few messages, Paula finally called "archives in San Diego County to see what [had] happened" to her daughter's case. The family was then required to "refile" the case with the sheriff's department in Lemon Grove.

*Defendant's Past Acts of Sexual Abuse, Including of Paula*

Paula testified that while she was growing up, defendant—her biological father—sexually abused her. Defendant was never charged in connection with this abuse. Paula estimated the abuse started when she was about six, and ended when she was about nine years old. Paula recalled the abuse typically occurred in her parents' bedroom. Defendant would make Paula take off her clothes and touch his "weaner" while he too was naked. Defendant would then force her to "stroke" his penis to the "point of

---

[3] San Diego Police Department detective Wendy Valentin testified that she worked in the sex crimes unit in 2008; that she received a "courtesy report from the Riverside Sheriff's Department and a CPS referral" about a "late disclosure that a victim at the age of 15 had reported that her maternal grandfather had molested her"; that Detective Valentin first spoke to Paula, then to Raquel, on the telephone; that Raquel was unsure if she wanted the police involved; and that as she was starting her investigation she learned the alleged abuse did not take place in the City of San Diego, but instead within the jurisdiction of the San Diego County Sheriff's Department. Detective Valentin thus forwarded her October 2008 report and the information she had received from Riverside to the sheriff's department in the City of Lemon Grove, for it to continue the investigation. In 2011, Detective Valentin transferred to the homicide unit. Sometime thereafter she spoke to Paula, who wanted to know the status of the case involving her daughter. Detective Valentin instructed Paula to call the sheriff's department, as the detective then knew nothing about the status of the case.

ejaculation." He also put candy on his penis so that Paula "could lick or suck the candy off."

Paula estimated that defendant abused her in this way about 20 times; that he tried to "make it fun and games" so she would not be afraid; and that he also touched her labia, after demanding she "[o]pen [her] legs." Paula described for the jury the sounds defendant would make as she stroked his penis, including when he ejaculated.

Although Paula could not remember the "first" time defendant abused her, she could remember the last time. As was the case with Raquel (and others, as discussed *post*), defendant instructed Paula not to tell anyone about the abuse. At some point, however, Paula began to feel "ashamed" and knew "there was something wrong." Paula testified Gloria saw a change in her, and asked Paula if she was okay. It was then Paula disclosed to her own mother that "dad had touched [her]."

As a result of this disclosure, defendant was prohibited from picking up Paula after school. Paula also noticed the disclosure "took a lot out of her [mother]." After the disclosure, Paula testified her relationship with defendant was "a little standoffish," but got better as she became a teenager, then abruptly ended when she was about 15 years old.

The record shows defendant stipulated that on February 24, 1988, he pleaded guilty to a violation of "section 288(a), lewd act on a child" under 14 years of age, in San Diego County Superior Court case number CR91480, which led to a six-year prison term. Victoria D. was the victim in the 1988 conviction, which served as a strike prior and serious felony prior in the instant case.

14

Victoria D. testified that she was 10 years old in the summer of 1986; that defendant and his family had a swimming pool and lived about two doors away from her home; and that during summer in 1986 and 1987, she would play with defendant's children, including Paula, and go swimming in their pool. Victoria estimated Paula then was about 16 years old.

Victoria and neighbor Tina often went on weekdays to defendant's home to swim. Usually they were alone with defendant, as Paula was rarely at home. Victoria described for the jury the "many times" defendant was "completely naked" and "touched himself" in front of the two girls. Victoria recalled one instance inside defendant's home when he masturbated in front of the girls, and his semen went "onto the floor." Defendant also showed the girls "nude magazines" and praised them for resembling the individuals pictured in the magazines. Defendant also had a "sex toy" and "there was touching of both [her] and Tina."

Regarding the touching, Victoria testified defendant used his hand to touch her vagina, both outside and inside—skin to skin—of her bathing suit. Victoria also saw defendant touch her friend Tina in the same manner. Defendant also told both girls to close their eyes and then he separately grabbed their hands and placed them on his penis. Victoria saw Tina touch defendant's penis, and Victoria also touched his penis, even after she had told him "no, no, no." Defendant sometimes offered the girls "a dollar or a soda or a candy bar" as an enticement to touch his penis. Defendant also told both girls that they were to tell nobody about the touching, as it was "strictly" between them.

15

In addition to the 1988 conviction, the record shows defendant in 1974 was convicted in Arizona of lewd and lascivious acts, case number CR76640. As described in his October 24, 2017 supplemental probation report, "defendant, by his own admission, went to [a grammar s]chool and saw three girls, one, [including] Terri B[.], who was nine years old. He talked to them about a sexual matter and became aroused. He kept their attention by asking if they would help him look for his dog. He masturbated in front of the three girls, and while doing so, felt . . . one of the girls over her pants. The defendant ejaculated and then cleaned himself with a newspaper. He walked the girls most of the way home, and then got into his car and went home. In his written statement, he indicated, 'I feel I need help, so this will never happen again.' "

In 1979, defendant was arrested after he exposed himself and masturbated in the presence of two five-year-old girls who lived in his neighborhood. Defendant pleaded nolo contendre to one count of annoying or molesting a child (former § 647, subd. (a)) and was placed on formal probation.

*Resentencing*

As noted, defendant in *Gutierrez I* was convicted of nine counts of lewd and lascivious acts upon a child under 14 years of age. Counts 1 and 2 involved defendant touching Raquel's vagina with his finger with the intent of arousing, appealing to, and gratifying his lust, passions and sexual desires; counts 3 and 4 involved defendant putting his mouth on Raquel's vagina; counts 5 and 6 involved defendant forcing Raquel to use her hand to touch his penis; count 7 involved defendant touching his penis to Raquel's vagina; and counts 8 and 9 involved defendant ejaculating on Raquel. As summarized

16

*ante*, each such act of abuse by defendant was set forth in two different counts—with the exception of count 7—because Raquel recalled each happened on (at least) two different occasions.

At resentencing, the court carefully summarized the breakdown of defendant's sentence as follows: "Count 1, Penal Code Section 288(a), with the [section] 667.61(a)(c)(d), Penal Code Section 667(b) through (i), and Penal Code Section 667(a)(1), the defendant is to serve 25 years to life. That is doubled by virtue of the strike prior to 50 years to life, adding a five-year consecutive for the serious felony prior.

"Count 2, which is Penal Code Section 288(a), and Penal Code Section 667.61(a)(c)(d), and Penal Code Section 667(b) through (i), plus Penal Code Section 667(a)(1), the defendant is sentenced to 25 years to life. That is doubled by operation of law to 50 years to life consecutive, with an additional five years consecutive based upon the serious prior. This total indeterminate term is 10 years, plus 100 years to life.

"Sentencing under Penal Code Section 1170.1, which is the determinant sentencing, Count 3, Penal Code Section 288(a), under Penal Code Section 667(b) through (i), the Court had previously selected the upper term of eight years. The Court is doubling that by operation of law to 16 years.

"Count 4, Penal Code Section 288(a), 667(b) through (i), again that will be upper term of eight years, doubled by operation of law to 16 years. That will run concurrent to Count 3. [¶] Count 5 also will be 16 years under the same analysis, and it also will run concurrent to Count 3. [¶] Count 6, and again these are all violations and convictions under Penal Code Section 288(a) and Penal Code Section 667(b) through (i), upper term

17

eight, doubled by operation of law to 16, to run concurrent with Counts 3, 4, 5. [¶]

Count 7, Penal Code Section 288(a), under Penal Code Section 667(b) through (i), again

will be 16 years, and that's the upper term doubled.

"In addition to that, the Court is selecting one-third the mid[-]term, which is 12

years consecutive, doubled, for a total term of four years. That four years will be

consecutive to the 16 years under Count 3.

"Count 8, Penal Code Section 288(a), Penal Code Section 667(b) through (i), is

again the upper term, eight years, doubled by operation of law to 16 years. That will run

concurrent with Count 3 and 4, 5 and 6. [¶] Count 9, Penal Code Section 288(a), Penal

Code Section 667(b) through (i), 16 years. Same analysis. And that will run concurrent.

"Penal Code Section 667(a)(1), the serious felony prior conviction is five years,

and that will run consecutive to the 16 years as Counts 3 and Count 7, which is the four

years consecutive.

"So the total determinant sentence will be 25 years. The total exposure therefore

is 35 years, plus 100 years to life."

DISCUSSION

I

*Cruel and/or Unusual Punishment*

The People assert, and we agree, that defendant forfeited any challenge to his

sentence based on a cruel and/or unusual punishment claim by not raising that issue either

in *Gutierrez I* (see *People v. Senior* (1995) 33 Cal.App.4th 531, 538 (*Senior*) [noting that

when a "criminal defendant could have raised an issue in a prior appeal, the appellate

18

court need not entertain the issue in a subsequent appeal absent a showing of justification for the delay"]) *or* in the trial court, both before and after remand (see *People v. Russell* (2010) 187 Cal.App.4th 981, 992–993 (*Russell*) [concluding the defendant forfeited his claim of cruel and unusual punishment based on impairment, which were issues that should have been addressed by the trial court, but nonetheless reaching the merits of his claim in the " 'interest of judicial economy' "]).

Although we conclude defendant has forfeited this claim of error on appeal (*Senior*, *supra*, 33 Cal.App.4th at p. 538; *Russell*, *supra*, 187 Cal.App.4th at pp. 992–993), we nonetheless reach the merits to "prevent the inevitable ineffectiveness-of-counsel claim" with respect to this specific issue. (*People v. Norman* (2003) 109 Cal.App.4th 221, 229–230; *Russell*, at p. 993.)

A. *Federal Constitution*

The Eighth Amendment of the United States Constitution, which applies to states under the due process clause of the Fourteenth Amendment, prohibits cruel and unusual punishment. (*Graham v. Florida* (2010) 560 U.S. 48, 58 (*Graham*).) In general, punishment is cruel and unusual under the Eighth Amendment if it is "grossly disproportionate" to the crime committed. (*Graham*, at p. 60.) In considering a proportionality challenge to a defendant's sentence, a court should consider "all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." (*Id.* at p. 59.) The court begins "by comparing the gravity of the offense and the severity of the sentence." (*Id.* at p. 60.) " 'In the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should *then*

19

compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." (*Ibid.*, italics added.)

Here, comparing the gravity of his offenses against the severity of his sentence, we conclude defendant has not met the initial threshold showing of "gross disproportionality" under the Eighth Amendment. (See *Graham*, *supra*, 560 U.S. at p. 60.) As noted by the trial court in reviewing defendant's supplemental probation report, there were no circumstances in mitigation within the meaning of California Rules of Court, rule 4.423[4] in connection with defendant's sentencing. There were, however, myriad circumstances in aggravation pursuant to rule 4.421, as further noted by the trial court.

Indeed, the trial court found that count 7 involved a "high degree of callousness" when defendant "tried to insert his penis into the victim's vagina." (See rule 4.421(a)(1).) The court noted Raquel in response "cried, and the evidence came out that [defendant] covered her mouth to prevent anyone from hearing her," as summarized *ante* when Raquel testified that while she was being sexually abused, she could hear a church service next door.

---

4       Further rule references are to the California Rules of Court.

20

The court also found that "defendant had been convicted of other crimes for which consecutive sentences could have been imposed" (see rule 4.421(a)(7)); that the crime "carried out indicates planning," as the record evidence showed defendant sexually abused Raquel at the tuxedo shop he owned and operated, where he took her knowing they would be alone (*id.*, (a)(8)); that defendant "took advantage of a position of trust to commit the offense," as confirmed by the record evidence showing Raquel at one point viewed defendant as a "father figure" (*id.*, (a)(11)); that "defendant's prior convictions as an adult were of increasing seriousness," as evidenced by his "first sex-related conviction in Arizona" in 1974, his misdemeanor conviction for a sex offense in 1979, and his 1988 conviction under former section 288, subdivision (a), all of which crimes involved girls of tender age, as summarized *ante* (rule 4.421(b)(2)); that "defendant denied during the trial he committed any of the acts, which may contribute to any emotional trauma this victim may have suffered, not only by the acts, but by reliving the incidents during multiple interviews and her subsequent testimony in court" (rule 4.408(a)); and that "during the investigation the defendant's own daughter admitted to police that [defendant] had molested her from the ages of 6 or 9 or 10 years old, and this was never reported to law enforcement," as also summarized *ante* (*ibid*).

" 'There exists a strong public policy to protect children of tender years.' (*People v. Olsen* (1984) 36 Cal.3d 638, 646.) Along a spectrum ranging from murder, mayhem and torture on one end to petty theft on the other, 'lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable.' (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806; see *Ashcroft v. Free Speech Coalition* (2002) 535 U.S.

21

234, 244 ['sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people'].)" (*People v. Baker* (2018) 20 Cal.App.5th 711, 724-725 (*Baker*).) As such, the One Strike law (§ 667.61),[5] on which a part of defendant's sentence was based, "sets forth an alternative, harsher sentencing scheme for certain forcible sex crimes." (See *People v. Mancebo* (2002) 27 Cal.4th 735, 738 (*Mancebo*).)

In cases *not* involving violence or sexual offenses, the United States Supreme Court has upheld sentences not unlike defendant's. (See, e.g., *Harmelin v. Michigan* (1991) (*Harmelin*) 501 U.S. 957, 994–995 [life without the possibility of parole for nonviolent possession of large quantity of cocaine]; *Ewing v. California* (2003) 538 U.S. 11, 18, 20, 30–31 (*Ewing*) [25 years to life in prison under Three Strikes law for felony petty theft]; *Lockyer v. Andrade* (2003) 538 U.S. 63, 68, 77 (*Lockyer*) [two consecutive terms of 25 years to life in prison under Three Strikes law for two counts of petty theft].)

Moreover, it is not cruel and unusual punishment to enhance the penalty for a crime because a defendant is a recidivist (*People v. Jameson* (1986) 177 Cal.App.3d 658,

---

5     Section 667.61 was amended effective January 1, 2019. (Stats. 2018, ch. 423 (Sen. Bill No. 1494), § 68, eff. Jan. 1, 2019.) The amendment made no substantive changes to subdivisions (a), (c), and (d) of former section 667.61, the provisions relied on by the trial court in resentencing defendant. Former section 667.61, subdivision (a) of the One Strike law provides in relevant part that any person "convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) . . . shall be punished by imprisonment in the state prison for 25 years to life." Subdivision (c) applies to offenses including "(4) Lewd or lascivious act, in violation of subdivision (b) of [former] Section 288." Subdivision (d) sets out various "circumstances" that "shall apply to the offenses specified in subdivision (c)" including, in part, "(1) The defendant has been previously convicted of an offense specified in subdivision (c) . . . ."

661-662, citing *Rummell v. Estelle* (1980) 445 U.S. 263, 265), so long as the ultimate punishment, all facts considered, is not disproportionate to the crime. (*Solem v. Helm* (1983) 463 U.S. 277, 284–288; *Harmelin*, *supra*, 501 U.S. at p. 997 (conc. opn. of Kennedy J.).)

Based on the United States Supreme Court decisions of *Harmelin*, *Ewing*, and *Lockyer*, which found that lengthy prison sentences were not "grossly disproportionate" to the nonviolent and/or petty theft crimes of recidivists in those cases, and our Legislature's determination that forcible sex crimes by a recidivist shall be harshly punished (*Mancebo*, *supra*, 27 Cal.4th at p. 738), we conclude the sentence of 35 years plus 100 years to life imposed on defendant is not grossly disproportionate under the Eighth Amendment.[6]

That defendant likely will spend the rest of his life in prison as a result of his age does not persuade us his sentence is grossly disproportionate to his offenses, particularly when viewed in light of his prior sexual misconduct spanning many decades. We thus reject his claim that his sentence constitutes cruel and unusual punishment under the Eighth Amendment.

---

[6] The record shows defendant's sentence could have been even longer, inasmuch as the court adopted probation's "cautious[]" recommendation not to sentence defendant under the One Strike law with respect to count 7—when defendant touched Raquel's vagina with his penis—because of the lack of both a "specific . . . time frame" and "information" with respect to this count.

B. *State Constitution*

Article I, section 17 of the California Constitution prohibits the infliction of cruel or unusual punishment. Punishment is cruel or unusual under the California Constitution if " 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*); see also *In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).)

*Lynch* analyzed three factors in determining whether a sentence is cruel or unusual under the California Constitution: (1) the nature of the particular offense and offender, with particular regard to the degree of danger which both present to society; (2) a comparison of the challenged penalty with the punishment prescribed in the same jurisdiction for other more serious offenses; and (3) a comparison of the challenged penalty with the punishment prescribed for the same offense in other jurisdictions. (*Lynch*, at pp. 425–427.) When determining the nature of the offender, courts consider "whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Dillon*, *supra*, 34 Cal.3d at p. 479.)

Applying the first *Lynch* factor here, as noted *ante* the record shows defendant's offenses in the instant case involved serious sexual misconduct occurring on at least four different occasions with an eight- or nine-year-old victim, who saw defendant—her grandfather—as a "father figure." The misconduct included at least two acts of defendant touching Raquel's vagina with his hand (counts 1 and 2); him putting his mouth on

24

Raquel's vagina (counts 3 and 4); him forcing Raquel to use her hand to touch his penis (counts 5 and 6); and him ejaculating on Raquel (counts 8 and 9). The misconduct also included an instance when defendant put his own penis on top of Raquel's vagina (count 7), and the uncharged misconduct of hoisting naked Raquel onto a copier located in the tuxedo shop and making copies of her buttocks and genitalia.

As also noted *ante*, the record shows that defendant by design took Raquel to the tuxedo shop because he knew they would be alone; that after each incident of sexual abuse, he made Raquel go to the bathroom and clean herself, after he had ejaculated on her; that also after each incident, he specifically instructed Raquel not to tell anybody about the abuse; and that in many if not all of the incidents, he overcame Raquel's will and forced her to participate in the inappropriate touching, even after she had said no and/or had removed her hand from his penis.

In addition, the record shows since 1974, defendant has engaged in sexual misconduct with multiple young victims. The 1974 conviction involved three grammar school girls, one of whom was nine years old. As noted, in that instance, defendant masturbated in front of the girls, touched one of them over their pants, and then ejaculated, using a "newspaper" to clean himself. In the 1979 incident, defendant entered a plea of nolo contendre for annoying/molesting a child under the age of 18, after he "exposed himself and masturbated in the presence of two five-year-old girls who were his neighbors."

And of course, in the incident that led to his prior serious felony conviction under former section 288, subdivision (a), defendant engaged in sexual misconduct with 10-

25

year-old Victoria (and 15-year-old Tina) that was similar to the offenses involving Raquel. This misconduct, as noted, occurred "many times" when Victoria and Tina went to defendant's home to swim during the summer of 1986 and 1987. It included defendant touching Victoria's vagina, both over and inside her bathing suit, and Tina's vagina; him masturbating and ejaculating in front of the girls; him giving the girls money or a "soda" as an inducement to touch his penis; him showing the girls "nude magazines" and a "sex toy"; and him telling them they were not to tell anyone about the abuse, as it was "strictly" between them.

Moreover, the record shows Raquel suffered significant emotional trauma as a result of being victimized by defendant. Specifically, the record shows Raquel in or about the 9th grade was not doing well in school or at home. Raquel testified that she then wanted to "kill herself" as a result of the abuse by defendant; that she also felt abandoned after her disclosure, including when her grandmother moved away; and that she felt guilty and ashamed, despite the fact *she* was the victim of such abuse.

Raquel and Paula both testified to the strain placed on the family because of the sexual abuse by defendant and Raquel's subsequent disclosure. Whereas, before her family often participated in family gatherings and parties, after the disclosure Raquel's family understandably avoided events if defendant was in attendance, and ultimately, stopped going to them altogether because it was just too uncomfortable. Ultimately, Raquel and her family moved away from San Diego, in part to distance themselves from defendant and his side of the family.

26

Thus, in considering the nature of the offenses and the offender in this case, with particular regard to the degree of danger he presents to society (see *Lynch*, *supra*, 8 Cal.3d at p. 425; see also *Dillon*, *supra*, 34 Cal.3d at p. 479), and evaluating the "totality of the circumstances surrounding the commission of the offense[s] . . . , including such factors as [their] motive, the way [they were] committed, the extent of the defendant's involvement, and consequences of his acts" (see *Dillon*, at p. 479), we conclude that defendant's sentence is not shocking or disproportionate to the offenses he committed. (Contra, *In re Rodriguez* (1975) 14 Cal.3d 639, 644, fn. 6, 654–655 [concluding a defendant's sentence was unconstitutional as applied, after the defendant served 22 years of an indeterminate life sentence under former section 288, because the defendant had a low IQ, was functionally illiterate and unskilled, his crime involved only one incident where he fondled the private parts of a six-year girl for a "few minutes," and no recidivist statute (i.e., One Strike law) was involved in sentencing the defendant], superseded by statute as stated in *People v. Jefferson* (1999) 21 Cal.4th 86, 95].)

Defendant nonetheless contends his punishment is cruel or unusual because he allegedly is not a "threat" to society. We note, however, the court at resentencing found otherwise, noting the offenses at issue were of "increasing seriousness" as compared to his earlier offenses, a finding we conclude is supported by ample record evidence. (See *People v. Powell* (2018) 5 Cal.5th 921, 944 [noting that in " 'considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a

27

reasonable trier of fact could find the defendant guilty beyond a reasonable doubt' [citation]"].)  In any event, the record evidence belies this contention, as it shows defendant engaged in sexually deviant behavior with multiple young girls over the course of decades.

Relying in part on *In re Nunez* (2009) 173 Cal.App.4th 709 (*Nunez*), defendant also contends his sentence is allegedly disproportionate because he had "no history of violence and no criminal history at all for more than 10 years before his arrest in the instant case."

First, this contention is belied by defendant's 1988 conviction under former section 288, subdivision (a), which as noted, constitutes a serious *violent* felony.  (See former[7] § 667.5, subd. (c)(6) [defining a "violent felony" to include "[l]ewd or lascivious act as defined in subdivision (a) or (b) of Section 288"].)

Second, *Nunez* is inapposite, as that case involved a 14-year-old defendant who suffered from a posttraumatic stress disorder and was sentenced to life in prison without the possibility of parole (LWOP) for kidnapping for ransom under former section 209, which has since been amended.  The court in *Nunez* concluded that the defendant's severe sentence was "so freakishly rare" (*Nunez*, *supra*, 173 Cal.App.4th at p. 715), inasmuch as he was the "only known offender under age 15 across the country and around the world subjected to an LWOP sentence for a nonhomicide, no-injury offense" (*ibid.*), as to

---

7    Section 667.5, like section 667.61, was amended effective January 1, 2019.  (Stats. 2018, ch. 423 (Sen. Bill No. 1494), § 68, eff. Jan. 1, 2019.)

constitute cruel and unusual punishment under the Eighth Amendment (*ibid*.). Unlike the "freakish[]" facts of *Nunez*, in the instant case defendant was sentenced as a recidivist for nine counts of sexual misconduct over the course of about a year with an eight- or nine-year-old victim who sustained substantial injury.

Third, the fact Raquel was abused in or about 2001 or 2002, but did not disclose that abuse until about 2008, and the fact that the investigation of law enforcement into the abuse was delayed for years thereafter as a result of a problem or miscommunication in the transfer of the investigation from the San Diego Police Department to the sheriff's department, in no way excuses or mitigates defendant's misconduct. As noted *ante*, defendant instructed Raquel after each incident of sexual abuse not to tell anyone. As also noted *ante*, expert testimony showed children in the majority of sexual abuse cases often wait to disclose, or never disclose, such abuse, particularly if the abuser is a parent, or "parent figure," which is how Raquel viewed defendant before he molested her. We thus conclude defendant's sentence falls far short of being one which is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity," as set forth under the first *Lynch* factor. (See *Lynch*, *supra*, 8 Cal.3d at p. 425.)

A determination of whether a punishment is cruel or unusual may be resolved solely under the first *Lynch* factor. (See, e.g., *Graham*, *supra*, 560 U.S. at p. 60; *Dillon*, *supra*, 34 Cal.3d at pp. 479, 482-488.) However, turning to the second *Lynch* factor, we conclude a comparison of defendant's punishment for his current crimes with the punishment for other crimes in California is inapposite because it was defendant's

29

recidivism—in combination with his current crimes—that placed him under the One Strike law.

Indeed, because the Legislature may constitutionally enact statutes imposing more severe punishment for habitual criminals, we decline to compare defendant's punishment for his "offense," which includes his recidivist behavior, to the punishment of others who perhaps have committed more serious crimes, but have not qualified as repeat felons. (See e.g., *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1136 [rejecting the defendant's comparison of his punishment to that of a murderer because that comparison "ignores that the three strikes law punishes not only his current offenses, but also his recidivism"]; *People v. Karsai* (1982) 131 Cal.App.3d 224, 242 [holding the sentence enhancements imposed on defendant for his conviction of the crimes of false imprisonment with force, oral copulation by force, and rape by force or violence did not constitute cruel and/or unusual punishment because (former) section 667.6 is "directed at recidivism by providing for longer enhancements for prior convictions of the same type of offense," and because "defendant's sentence is not the product of an isolated conviction for a single offense but is the result of conviction for multiple violent sex offenses after having previously been convicted of multiple violent sex offenses"], overruled on another ground as stated in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.)

Defendant fares no better when comparing California's punishment scheme to those of other states, including Oregon and New York—on which he specifically relies. "That California's punishment scheme is among the most extreme does not compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional

30

consideration does not require California to march in lockstep with other states in fashioning a penal code. It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide.' (*People v. Wingo* (1975) 14 Cal.3d 169, 179 [(*Wingo*)].) Otherwise, California could never take the toughest stance against repeat offenders or any other type of criminal conduct." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.)

Although defendant contends the maximum sentence in Oregon for a single offense would be 20 years (Or. Rev. Stat., § 161.605 et seq.), his contention ignores the fact he also was punished in the instant case for his recidivism and for nine counts of sexual misconduct, not one.

In any event, under Oregon law the "presumptive sentence for a sex crime that is a felony is life imprisonment without the possibility of release or parole *if* the defendant has been sentenced for sex crimes that are felonies at least two times prior to the current sentence." (Or. Rev. Stat., § 137.719(1), italics added.)[8]

Similarly, in New York when a person is found to be a "persistent violent felony offender," the court "must impose an indeterminate sentence of imprisonment, the maximum term of which shall be life imprisonment." (N.Y. Pen. Law, § 70.08, subds.

---

8    Although we concluded in *Gutierrez I* that defendant's Arizona conviction could not be used as a prior serious felony strike in California, it appears that conviction could potentially qualify as a "sex crime" within the meaning of section 137.719(1) of the Oregon code. (See Or. Rev. Stat., § 163A.005, subd. (5) [defining "sex crime" to include (d) "[s]exual abuse in any degree," (g) "[e]ncouraging child sexual abuse in any degree," and/or (n) "[s]exual misconduct if the offender is at least 18 years of age"].)

31

(1)(a) & (2).)  A "persistent violent felony offender" is defined to include a person convicted under New York Penal Law section 130.96.  (N.Y. Pen. Law, § 70.08, subd. (1)(a).)  Section 130.96 of the New York Penal Law in part provides that a person "is guilty of predatory sexual assault against a child when, being eighteen years old or more, he or she commits the crime of . . . course of sexual conduct against a child in the first degree, . . . and the victim is less than thirteen years old."  (N.Y. Pen. Law, § 130.96.)

A person is guilty of the crime of "course of sexual conduct against a child in the first degree" in New York "when, over a period of time not less than three months in duration: [¶] (a) he or she engages in two or more acts of sexual conduct, which includes at least one act of . . . oral sexual conduct . . . or [¶] (b) he or she, being eighteen years old or more, engages in two or more acts of sexual conduct, which include at least one act of . . . oral sexual conduct . . . , with a child less than thirteen years old."  (N.Y. Pen. Law, § 130.75, subds. (1)(a) & (b).)

Turning to the instant case, if defendant was convicted in New York of the nine offenses of sexual misconduct against Raquel, he would meet the definition of a "persistent violent felony offender" under section 130.96 of the New York Penal Law, as the offenses would qualify as a "course of sexual conduct against a child in the first degree" under section 130.75 of that same law.  Indeed, the record shows that defendant committed the nine offenses "over a period of time not less than three months in duration" (N.Y. Pen. Law, § 130.75, subd. (1)); and that over about a year period, he engaged in "two or more acts of sexual conduct," one of which involved "oral sexual conduct" with "a child less than eleven years old." (*Id.*, subd. (1)(a).)

32

Defendant also meets the alternate definition of "course of sexual conduct against a child" set forth in subdivision (1)(b) of this statute, as he was "eighteen years or more" when he engaged over about a year period in "two or more acts of sexual conduct, which include at least one act of . . . oral sexual conduct . . . with a child less than thirteen." (N.Y. Pen. Law, § 130.75, subd. (1)(b).)  Thus, defendant would face an "indeterminate sentence of imprisonment" in New York, which includes as an option "life imprisonment."  (N.Y. Pen. Law, § 70.08, subd. (2).)

Moreover, as we noted in *Baker*, myriad states impose harsh penalties for sexual misconduct of a child, including life in prison.  (*Baker*, *supra*, 20 Cal.App.5th at p. 731.)[9] Although defendant's punishment on *nine* counts is no doubt severe, based on the three *Lynch* factors we conclude it is not so disproportionate to the punishment he could have

_____

[9]       We noted in *Baker* that California, among other states, was not an "outlier[]" when it came to imposing a harsh punishment on a defendant for engaging in serious sexual misconduct of a child under the age of 14 (i.e., oral copulation with a minor):  "Fla. Stat. Ann. §§ 800.04(5)(b) & 775.082(3)(a)4 [life or 25-year minimum for lewd act on child under 12]; Kan. Stat. Ann. §§ 21-5506(b)(3)(A), 21-6627(a)(1)(C) [25 years to life for fondling or touching of a child under 14]; Nev. Rev. Stat. Ann. §§ 201.230(2) [10 years to life for a lewd act on a child under 14], 200.366(1)(b) & (3) [35 years to life for sexual penetration of a child under 14 if no substantial bodily harm; else, life without parole]; Ariz. Rev. Stat. §§ 13-705(A) [life sentence for dangerous crimes against children including sexual conduct with a child under 12]; Mich. Comp. Laws Serv. § 750.520b (1)(a) & (2)(b) [25 years to life for sexual penetration of a child under 13]; Miss. Code Ann. §§ 97-3-101(3), 97-3-95(1)(d) [20 years to life for sexual penetration of a child under 14]; Neb. Rev. Stat. Ann. § 28-319.01(1)(a) & (2) [15-year minimum for sexual penetration of a child under 12]; R.I. Gen. Laws §§ 37-8.1, 37-8.2 [25 years to life for sexual penetration of a child under 14]; S.C. Code Ann. §§ 16-3-651(h), 16-3-655(A)(1), (D)(1) [25 years to life for oral copulation of a child under 11]; Utah Code Ann. § 76-5-403.1(1) & (2)(a) [25 years to life for oral copulation of a child under the age of 14.]" (*Baker*, at p. 731.)

33

faced in other states, particularly in light of his recidivism, to render his sentence constitutionally infirm.  (See *Wingo*, *supra*, 14 Cal.3d at p. 179; *Lynch*, *supra*, 8 Cal.3d at p. 424; *Baker*, 20 Cal.App.5th at p. 731.)

Finally, defendant contends his sentence is even more cruel and/or unusual because it is largely mandatory.  We rejected a similar argument raised by the defendant in *Baker*:  " '[T]here can be no serious contention . . . that a sentence which is not otherwise cruel and unusual becomes so simply because it is "mandatory." ' (*Harmelin*[, *supra*,] 501 U.S. [at p.] 995 [upholding mandatory life sentence without parole for first-time offender for possession of 672 grams of cocaine]; see *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1214 [same principle applies to state constitutional challenge].)" (*Baker*, *supra*, 20 Cal.App.5th at p. 731.)  We thus reject defendant's claim he was subjected to cruel and/or unusual punishment because his sentence was largely mandatory.

## II

### *Petition*

A.  *Senate Bill No. 1393*

As noted *ante*, defendant in his petition asks us to remand to allow the trial court to exercise discretion newly granted it by Senate Bill No. 1393 (Stats. 2018, ch. 1013, §§ 1 & 2) to strike one or more of his serious felony priors used to support the five-year enhancements under section 667, subdivision (a)(1).  Prior to Senate Bill No. 1393's adoption, the law prohibited courts from striking felony priors used for purposes of the section 667 enhancement.  (Former § 1385, subd. (b).)  However, effective January 1,

2019, Senate Bill No. 1393 removed that prohibition, and defendant contends it is retroactive and applies to all cases not yet final as of its effective date, such as this case. We agree.

Indeed, absent evidence to the contrary, amendments to statutes that reduce the punishment for a crime or vest in trial courts the discretion to impose a lesser penalty, such as Senate Bill No. 1393, apply to all defendants whose judgments are not final as of the amendment's effective date. (*In re Estrada* (1965) 63 Cal.2d 740, 742; *People v. Garcia* (2018) 28 Cal.App.5th 961, 972.) When it enacted Senate Bill No. 1393, the Legislature did not indicate it intended the legislation to apply prospectively only. (*Garcia*, at p. 972.) The act thus applies retroactively to this case.

We are required to remand in instances such as this "unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement" even if it had the discretion. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) The record here contains no such evidence. We thus remand for the court to consider striking one or more of the serious felony priors that support the enhancements imposed under section 667, subdivision (a)(1).

B. *Imposition of Fines, Fees, and Assessments*

Briefly, in *Gutierrez I* the trial court imposed without objection a $10,000 restitution fine (§ 1202.4, subd. (b)(1)) and a suspended matching parole revocation fine (§ 1202.45). The court then stated it "finds the defendant has the financial ability to pay the court security fee of [$]360 [(§ 1465.8)], the ICNA [i.e., Immediate Critical Needs

35

Account] fee of [$]270 [(Gov. Code, § 70373), a] Criminal Justice fee of [$]164 [(Gov. Code, § 29550.1), and a] sex registration fee of $500 [(§ 290.3)]."  Defendant also did not object to the imposition of these fees.

Following *Gutierrez I*, the court at resentencing again imposed without objection a $10,000 restitution fine and a suspended matching parole revocation fine, a $360 court security fee, a $270 ICNA fee, a $154 criminal justice administration fee,[10] and a $500 sex registration fee.  As noted, defendant first raised the issue of his alleged inability to pay these fines and fees in his petition, relying on *Dueñas*, *supra*, 30 Cal.App.5th 1157.

In *Dueñas*, the defendant at sentencing objected on due process grounds to the trial court's imposition of a $30 court facilities assessment (Gov. Code, § 70373), a $40 court operations assessment (§ 1465.8), and a statutory minimum $150 restitution fine (§ 1202.4, subd. (b)(1)).  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1162.)  The defendant in *Dueñas* was a probationer who suffered from cerebral palsy, was indigent, homeless, and the mother of young children.  The court agreed to, and held, a separate inability-to-pay hearing as requested by the defendant.

The trial court at that hearing considered the defendant's "uncontested declaration concerning her financial circumstances, determined that she lacked the ability to pay the previously ordered attorney fees, and waived them on the basis of her indigence.  The court concluded that the $30 court facilities assessment under Government Code section

_____

10    The criminal justice administration fee imposed by the court on remand was $10 less than the fee it had previously imposed in *Gutierrez I* pursuant to Government Code section 29550.1.

70373 and $40 court operations assessment under . . . section 1465.8 were both mandatory regardless of [her] inability to pay them" (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1163), and that she failed to show " 'compelling and extraordinary reasons' required by statute (Pen. Code, § 1202.4, subd. (c)) to justify waiving [the $150] fine.  The court rejected Dueñas's constitutional arguments that due process and equal protection required the court to consider her ability to pay these fines and assessments . . . ."  (*Dueñas*, at p. 1163.)

In reversing, the *Dueñas* court concluded that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373" (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164); and that, "although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine."  (*Ibid.*)

The application of *Dueñas* has been addressed in several recent cases.[11]  In *People v. Castellano* (2019) 33 Cal.App.5th 485 (*Castellano*), the same division of the Second Appellate District that filed *Dueñas* applied its holding to a defendant who had

---

[11]    Because we resolve this issue on forfeiture grounds, we express no opinion on whether *Dueñas* was correctly decided.

37

been assessed various court fees and the statutory minimum restitution fine. (*Castellano*, at pp. 488-489.) In doing so, the court explained that a defendant must "in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed and at a hearing present evidence of his or her inability to pay the amounts contemplated by the trial court." (*Id.* at p. 490.) It held, however, that the defendant's failure to object to the fine and fees before *Dueñas* was decided was not a forfeiture of the issue because *Dueñas* was "a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial." (*Castellano*, at p. 489.) More recently in *People v. Johnson* (2019) 35 Cal.App.5th 134 (*Johnson*), the court agreed with *Castellano* on the forfeiture issue, commenting "we are hard pressed to say [the *Dueñas*] holding was predictable and should have been anticipated." (*Johnson*, at p. 138, fn. omitted.)

In *People v. Frandsen* (2019) 33 Cal.App.5th 1126 (*Frandsen*) the court took a different approach on forfeiture. There, the trial court assessed various fees totaling $120 and imposed a statutory maximum $10,000 restitution fine. The appellate court first rejected the defendant's contention that his *Dueñas*-based challenge to the fine and fees presented a purely legal claim that could be raised for the first time on appeal. (*Frandsen*, at p. 1153.) It likewise found unpersuasive the argument that *Dueñas* was unforeseeable. (*Frandsen*, at p. 1154.) Finally it noted that an objection would not have been futile because even pre-*Dueñas* governing law permitted a challenge to a maximum restitution fine based on ability-to-pay grounds. (*Frandsen*, at p. 1154.)

We find it unnecessary to address any perceived disagreement on the forfeiture issue between *Frandsen* on one hand and *Castellano* and *Johnson* on the other. Both *Castellano* and *Johnson* involved situations in which the trial court imposed the statutory *minimum* restitution fine. (*Castellano, supra,* 33 Cal.App.5th at p. 488; *Johnson, supra,* 35 Cal.App.5th at pp. 137-138 and fn. 5.) In this case, as in *Frandsen*, the trial court imposed the statutory *maximum* restitution fine. And as *Frandsen* correctly notes, even before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute (§ 1202.4, subd. (c)) expressly permitted such a challenge. (*Frandsen, supra,* 33 Cal.App.5th at p. 1154.)

On two separate occasions, Gutierrez had the statutory right to request that the court consider his ability to pay in setting the restitution fine, but he did not do so. His silence is a classic example of the application of the forfeiture doctrine relied upon by the California Supreme Court in numerous criminal sentencing cases decided well before *Dueñas.* (See, e.g., *People v. Aguilar* (2015) 60 Cal.4th 862, 864 [applying the forfeiture rule to challenges to probation-related costs and an order for reimbursement of fees paid to appointed trial counsel]; *People v. Trujillo* (2015) 60 Cal.4th 850, 853-854 [applying the forfeiture rule to an unpreserved claim regarding probation-related fees and defendant's inability to pay them]; *People v. Nelson* (2011) 51 Cal.4th 198, 227 [defendant's claim that the trial court erred by failing to consider ability to pay a restitution fine is forfeited by the failure to object].) Thus, even if *Dueñas* was unforeseeable (a point on which we offer no opinion), under the facts of this case

39

Gutierrez forfeited any ability-to-pay argument regarding the restitution fine by failing to object.

The same is true of the fees the court imposed.[12]  As a practical matter, if Gutierrez chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees. Moreover, at the time of sentencing the court relied on trial testimony and the probation report to make a factual finding that "defendant has the financial ability to pay" these fees.  Gutierrez did not object, a decision that is understandable in view of his lengthy employment history, including service as an aircraft mechanic, manager of retail tuxedo shops and, at the time of trial, 12 years' experience operating a taco shop.

## DISPOSITION

The matter is remanded *only* for resentencing to allow the court to consider whether it should strike one or more of defendant's serious prior felonies on which the enhancements imposed under section 667, subdivision (a)(1) are based.  In all other

_____

[12]    Gutierrez also forfeited the right to challenge the imposition of the sex registration fee.  That statute authorizes the court to consider ability to pay, the court found he had the ability to pay, and he failed to object.

respects, the judgment—including all fines, fees, and assessments imposed by the trial court—is affirmed.[13]

                                                                                    HALLER, J.

I CONCUR:


DATO, J.

---

[13] We note that defendant in his supplemental briefing argued that, *if* the issue of inability to pay is deemed forfeited, as we have concluded, he was deprived effective assistance of counsel based on his counsel's failures to object to the section 1202.4 restitution fine. We decline to reach this issue on this record, without prejudice to defendant raising the ineffective assistance of counsel issue in a separate proceeding, if he so chooses.

BENKE, J., concurring in part.

Defendant in his petition relied on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), this time seeking an ability-to-pay hearing despite *twice* failing to object to the imposition of the fines and fees. The majority finds the various fines and fees imposed on defendant at resentencing were not improper. I agree with the majority's conclusion. I write separately, however, because I disagree with the majority's reasoning in support of its conclusion. More fundamentally I write to express my disagreement with *Dueñas*, which I believe misapplies California's statutory law and erroneously selects a general due process and equal protection theory as the basis for its decision. I instead believe that the Eighth Amendment to the United States Constitution offers a more proper basis for determining when a fine or fee exceeds constitutional limits, to the extent such an analysis is necessary.

*The Majority Opinion*

As noted, the record shows defendant did not object either in *Gutierrez I*, or on remand from that appeal, to the imposition of the following fines and fees: a $10,000 restitution fine (Pen. Code, § 1202.4, subd. (b)(1))[1] and a suspended matching parole revocation fine (§ 1202.45); a $360 court security fee (§ 1465.8); a $270 Immediate and

---

[1]     Further statutory references are to the Penal Code unless otherwise stated.

Critical Needs Account fee (Gov. Code, § 70373); a $154 criminal justice administration fee (Gov. Code, § 29550.1);[2] and a $500 sex offender registration fee (§ 290.3).

The majority expresses no opinion on whether *Dueñas* was properly decided (fn. 11), but instead finds the case inapplicable because the trial court here imposed a restitution fine under section 1202.4, subdivision (b)(1) above the statutory minimum, and thus, defendant, unlike Ms. Dueñas, had the right under subdivision (c)[3] of this statute to object on inability-to-pay grounds.

The majority goes on to find that, as a result of section 1202.4, subdivision (c), defendant's failure to object to the restitution fine constituted a forfeiture irrespective of *Dueñas*. On that basis, the majority also finds that, if defendant did not object based on inability to pay the $10,000 restitution fine, he certainly could not complain about the remaining fees, which collectively were substantially less than the restitution fine; and that, in any event, the trial court made a finding defendant had the ability to pay.

---

[2]     The criminal justice administration fee imposed by the court on remand was $10 less than the fee it had previously imposed pursuant to Government Code section 29550.1 in *Gutierrez I*.

[3]     Subdivision (c) of section 1202.4 in part provides:  "The court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record.  A defendant's *inability to pay shall not be considered* a compelling and extraordinary reason not to impose a restitution fine.  Inability to pay may be considered *only* in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)."  (Italics added.)

2

Dueñas *and its Constitutional Underpinning*

Unlike the majority, I am not certain that *Dueñas* can be so easily dismissed. *Dueñas* involved unique facts that have been well-documented by others, so I will refrain from repeating them here. But the directive of *Dueñas* is clear: "due process of law requires the trial court to conduct an inability to pay hearing and ascertain a defendant's *present* ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373" (*Duenas*, *supra*, 30 Cal.App.5th at p. 1164, italics added); and that, "although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of *any* restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*, italics added.)

In support of its reasoning, the *Dueñas* court relied on *Griffin v. Illinois* (1956) 351 U.S. 12 (*Griffin*) and related case law. It also cited several Government Code sections in concluding our Legislature also "has recognized the deleterious impact of increased court fees on indigent people" (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1165); further noting as follows on this point: "The Legislature has declared that 'our legal system cannot provide "equal justice under law" unless all persons have *access* to the courts without regard to their economic means. California law and court procedures should ensure that court fees are not a barrier to court *access* for those with insufficient economic means to pay those fees.' (Gov. Code, § 68630, subd. (a).) The Legislature has

3

also declared that 'fiscal responsibility should be tempered with concern for litigants' rights to *access* the justice system. The procedure for allowing the poor to *use* court services without paying ordinary fees must be one that applies rules fairly to similarly situated persons, is accessible to those with limited knowledge of court processes, and does not delay *access* to court services.' (Gov. Code, § 68630, subd. (b).)

"Accordingly, the Legislature has provided for fee waivers for indigent litigants at the trial and appellate court levels that excuse them from paying fees for the first pleading or other paper, and other court fees and costs, including assessments for certain court investigations. (Gov. Code, § 68631.) Government Code section 68632 grants permission to proceed without paying costs to those receiving certain public assistance benefits, to those whose monthly income is 125 percent or less of government poverty guidelines, and to those who 'cannot pay court fees without using moneys that normally would pay for the common necessaries of life for the applicant and the applicant's family.' (Gov. Code, § 68632, subds. (a)-(c).)

"While this protective mechanism lessens the disproportionate burden that these fundraising fees present to indigent litigants in the civil context, the Legislature neither instituted nor rejected a corresponding safeguard for assessments attached to a criminal conviction. Both Government Code section 70373 and . . . section 1465.8 are silent as to the consideration of a defendant's ability to pay in imposing the assessments." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1165–1166, italics added, fn. omitted.)

After additional policy discussion, the *Dueñas* court concluded the assessment provisions of Government Code section 70373 and section 1465.8, "if imposed without a

4

determination that the defendant is able to pay, are thus fundamentally unfair; imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution.  (U.S. Const. 14th Amend.; Cal. Const., art. I, § 7.)  These fees, assessed as part of a larger statutory scheme to raise revenue to fund court operations, should be treated no differently than their civil counterparts enacted in the same legislation and imposed only on those with the means to pay them.  [Citation.]" (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1168–1169, fn. omitted.)

Dueñas *and its Repercussions*

Since *Dueñas* was decided, this court has been flooded with petitions for rehearing and requests to submit supplemental briefing on the issue of ability to pay fines and fees imposed on defendants.  Defendant in the instant case is no exception.  I note new cases, most unpublished, are filed almost daily in which *Dueñas*'s ability-to-pay hearing is an issue.  Some defendants in the first instance are also moving under *Dueñas* for such relief in the trial courts, despite having pending appeals, and then moving to augment the records on appeal with minute orders showing the trial courts in the first instance granted

5

their "*Dueñas* motions."[4]  (See, e.g., *People v. Adame* (May 29, 2019) 2019 LEXIS 3642, *1, fn. 2.)

There has also been a succession of cases analyzing whether a defendant forfeits *Dueñas*'s newly created constitutional right to a preassessment ability-to-pay hearing by failing to make this specific objection in the trial court.  Some of the cases have found there was a forfeiture,[5] others have found no forfeiture,[6] and still others have either

---

[4]    I note that under section 1237.2, a trial court retains jurisdiction even after a notice of appeal has been filed to "correct any error in the imposition or calculation of fines, penalty assessments, surcharges, fees, or costs upon the defendant's request for correction," but with an important exception:  this statute "*only* applies in cases where the erroneous imposition or calculation of fines, penalty assessments, surcharges, fees, or costs are the *sole* issue on appeal."  (Italics added.)

[5]    See, e.g., *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153, 1155 (*Frandsen*) [refusing the defendant's request for an ability-to-pay hearing based on *Dueñas* because *Dueñas*'s announcement of a newly created constitutional right was not an "unforeseen change in the law," as the *Dueñas* court applied "law that was old, not new," and thus, concluding that it "stand[s] by the traditional and prudential virtue of requiring parties to raise an issue in the trial court if they would like appellate review of that issue"], *People v. Bipialaka* (2019) 34 Cal.App.5th 455 [citing *Frandsen* in concluding without analysis that the defendant forfeited his objection to various fines and fees based on inability to pay by failing to make that objection in the trial court].  Thus, I note that even courts that have disagreed with *Dueñas* have done so not because they disagree with its holding that due process and equal protection afford a defendant an ability-to-pay hearing before fines and fees can be imposed, but rather on the basis that such a right, if its exists, can be waived or "forfeited."  (See, e.g., *Frandsen*, at p. 1155.)

[6]    See, e.g., *People v. Castellano* (2019) 33 Cal.App.5th 485, 489 [finding no forfeiture because when the defendant was sentenced, *Dueñas* had not yet been decided, and no California court before *Dueñas* had held it was unconstitutional to impose fines, fees, and assessments without a predetermination of the defendant's ability to pay].

6

found *Dueñas* to be factually distinguishable,[7] or refused to decide the issue altogether, stating that because remand was necessary on another ground, a defendant then could raise the ability-to-pay issue in the trial court.  To these cases the majority here adds refusal to apply *Dueñas* altogether.  The result of *Dueñas* has been neither fair to all appellants nor consistent.  I see no reason to refrain from examining its correctness.

Dueñas's *Analysis is Fundamentally Flawed*

Unlike the majority, I instead would conclude the *Dueñas* decision incorrectly applies California statutes; and in addition, is fundamentally flawed in that general "fairness" grounds of due process and/or equal protection principles do not afford a defendant a preassessment ability-to-pay hearing before a trial court imposes fines and fees on him or her.

First, I believe that in reaching its conclusions, *Dueñas* by judicial fiat inserted language into statutes that did not exist.  That is, I note the adjective "present" used by the *Dueñas* court in its ability-to-pay analysis is nowhere to be found in Penal Code sections 1202.4 and 1465.8, or in Government Code section 70373.  (See *Dueñas*, *supra*, 30 Cal.App.5th at p. 1164; but see Pen. Code, § 987.8 [noting if a defendant is provided legal assistance, following the conclusion of criminal proceedings a court "may, after

---

7       See, e.g., *People v. Johnson* (2019) 35 Cal.App.5th 134, 138 (*Johnson*) [distinguishing *Dueñas* on the ground that it involved a "homeless probationer . . . who suffered from cerebral palsy and was unable to work," in contrast to the defendant in its case who was serving an eight-year prison sentence and who had "ample time to pay [various fines and fees] from a readily available source of income while incarcerated," and thus finding any alleged due process error harmless beyond a reasonable doubt].

notice and hearing, make a determination of the *present ability* of the defendant to pay all or a portion of the cost thereof" (italics added)].)

Perhaps more egregiously, *Dueñas* in its analysis completely disregarded unambiguous language in subdivision (c) of section 1202.4 stating that inability to pay cannot be considered when only the statutory minimum is imposed, as was the case there. Moreover, by also adding the word "present" to the ability-to-pay analysis with respect to the restitution fine, *Dueñas* ignored section 1202.4, subdivision (d), which says the exact opposite: "Consideration of a defendant's inability to pay may include his or her *future earning capacity*." (Italics added.) A court lacks the power to rewrite a statute either so as to make it conform to a presumed intention that is not stated, or to ignore a statute's plain and unambiguous language. (See *People v. Statum* (2002) 28 Cal.4th 682, 692.)

I would conclude that, to the extent the *Legislature* provided such a right, which in the instant case it did with respect to the restitution fine (see § 1202.4, subds. (b)(1) & (c)) and the sex offender registration fee (see § 290.3, subd. (a)),[8] a defendant's failure to avail him- or herself of that *statutory* relief constituted a forfeiture under the "traditional" rule. (See *Frandsen*, *supra*, 33 Cal.App.5th at p. 1155.)

---

[8]    Subdivision (a) of section 290.3 provides: "Every person who is convicted of any offense specified in subdivision (c) of Section 290 shall, in addition to any imprisonment or fine, or both, imposed for commission of the underlying offense, be punished by a fine of three hundred dollars ($300) upon the first conviction or a fine of five hundred dollars ($500) upon the second and each subsequent conviction, *unless the court determines that the defendant does not have the ability to pay the fine*." (Italics added.)

Second, with regard to the application of general due process and equal protection principles, the heavy reliance *Dueñas* places on *Griffin* was, in my view, misplaced. *Griffin* involved the issue of court *access*. Specifically, that case concluded that due process and equal protection guaranteed an indigent criminal defendant a free transcript of trial proceedings in order to provide that defendant with *access* to a court of review, where he would receive an adequate and effective examination of his criminal conviction. (*Griffin*, *supra*, 351 U.S. at p. 16.)

I, for one, do not believe the imposition of the two assessments and one restitution fine on the defendant in *Dueñas* is an issue of access to our courts or justice system, as was the case in *Griffin* and similar authorities.[9] Nor do I believe the fines or fees imposed on the defendant in *Dueñas* satisfied the traditional due process definition of a taking of life, liberty or property.

Likewise**,** *Dueñas*'s citations to multiple provisions of the Government Code do not support its conclusion that our "Legislature has recognized the deleterious impact of

---

[9] Consistent with the holding of *Griffin* and its concern of fair access for all to our courts and justice system, subdivision (b) of former section 987.8 provided: "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court, or upon the withdrawal of the public defender or appointed private counsel, the court may, after notice and a hearing, make a determination of the *present ability of the defendant to pay all or a portion of the cost thereof.* The court may, in its discretion, hold one such additional hearing within six months of the conclusion of the criminal proceedings. The court may, in its discretion, order the defendant to appear before a county officer designated by the court to make an inquiry into the ability of the defendant to pay all or a portion of the legal assistance provided." (Italics added.) I note that current subdivision (b) of this statute is substantively identical.

9

increased court fees on indigent people." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1165.) In my view, these statutes instead ensure that all people, without regard to economic status, have equal access to our justice system. Again, in my opinion the imposition of the two assessments and one restitution fine on the defendant in *Dueñas* was not an issue of *access* to the courts or our system of justice.

In sum, I find no general due process and equal protection authority which *requires* a court to conduct a *preassessment present ability-to-pay* hearing before imposing any fine or fee on a defendant, as *Dueñas* seems to conclude. On a practical note, it takes little imagination to envision the potential expansion of the holding of *Dueñas* to a multitude of other fines or fees that were not the subject of that case, or the instant case. One such possible fine is victim restitution, which is encompassed in subdivision (f) of section 1202.4 — one of the same statutes at issue in *Dueñas*. Although that subdivision expressly requires a court to order "full restitution" to the victim, should the constitutional basis of *Duenas* stand, any restitution hearing might require a finding of *present ability* to pay victim restitution.

Finally, I would further conclude relief from fines or fees based on inability to pay is more properly analyzed under the Eighth Amendment prohibition against excessive fines, fees, and punishment, which analysis I turn to next.

*The Excessive Fines Clause*

Rejection of the due process and equal protection analysis of *Dueñas* does not leave parties without recourse if they believe a statutory assessment of fines, fees, and punishment amounts to a constitutional violation as written or applied.

10

To the extent defendant in the instant case claimed poverty is the "only reason [he] cannot pay the fine[s] and fees," as was the case in *Dueñas* (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1160), I would analyze that claim under the excessive fines clauses of both the Eighth Amendment,[10] made applicable to the states through the Fourteenth Amendment, as recently announced by the United Supreme Court in *Timbs v. Indiana* (2019) __ U.S. __, 139 S.Ct. 682, as well as article 1, section 17, of our state constitution.[11]

The Eighth Amendment prohibits the imposition of excessive fines. The word "fine," as used in that provision, has been interpreted to be " 'a payment to a sovereign as punishment for some offense.' " (*United States v. Bajakajian* (1998) 524 U.S. 321, 327–328 (*Bajakajian*).) A fine is excessive for purposes of the Eighth Amendment "if it is grossly disproportionate to the gravity of the defendant's offense." (*Id.* at p. 334.)

Briefly, in *Bajakajian* the defendant attempted to take $357,144 out of the country, in contravention of federal law requiring any person transporting more than $10,000 out of the United States to file a report with the appropriate government agency. The government in *Bajakajian* claimed that the entire $357,144 was forfeited. (*Bajakajian*, *supra*, 524 U.S. at p. 325.)

---

10    The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

11    Article 1, section 17 of our state Constitution provides, "Cruel or unusual punishment may not be inflicted or excessive fines imposed."

The high court in *Bajakajian* pointed out that "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality." (*Bajakajian*, *supra*, 524 U.S. at p. 334.) As found by our own high court, *Bajakajian* "then set out four considerations: (1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's *ability to pay*." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728 (*R.J. Reynolds*), citing *Bajakajian*, at pp. 337–338.) After reviewing those considerations, the *Bajakajian* court held that the forfeiture of the defendant's currency constituted an excessive fine barred by the Eighth Amendment. (*Bajakajian*, at p. 343.)

I believe the application of an Eighth Amendment analysis allows for consistent and fair review of fines and fees imposed on individuals while they are focused both legally and factually in the trial court, with the appeal process remaining available for review.

In the instant case, with respect to the restitution fine of $10,000 and the sex offender registration fee of $500, I would find that defendant forfeited his *statutory* right by failing to object to such imposition and make a showing of inability to pay. With respect to the remaining fines and fees, I would find that, to the extent defendant challenged them based only on his indigency, such fines and fees are not "excessive" in violation of the Eight amendment of the federal Constitution, or article 1, section 17 of our state Constitution, based on the *Bajakajian* "considerations" as identified by our own high court. (See *R.J. Reynolds*, *supra*, 37 Cal.4th at p. 728, citing *Bajakajian*, *supra*, 524

12

U.S. at pp. 337–338.)  On this basis, I thus would affirm the fines and fees imposed on defendant in the instant case.


BENKE, Acting P. J.